UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BEEDEMARIAM KASSAW,

                    Plaintiff,                          **DECISION AND ORDER**

          v.                                            6:23-CV-06181 EAW

WAL-MART CORPORATION,

                    Defendant.
_____

## INTRODUCTION

Proceeding *pro se*, plaintiff Beedemarian Kassaw ("Plaintiff") commenced the above-captioned action against defendant Wal-Mart Corporation[1] ("Defendant" or "Walmart"), alleging that Defendant subjected him to a discriminatory and retaliatory work environment, failed to promote him based on his race, breached a contract to provide him full-time benefits, and failed to pay him wages and bonuses. (Dkt. 1-2). Presently before the Court is Defendant's motion for summary judgment (Dkt. 54), Defendant's motion to strike Plaintiff's counterstatement of facts (Dkt. 72), and Defendant's motion for sanctions (Dkt. 86). For the following reasons, Defendant's motion for summary judgment (Dkt. 54) is granted, Defendant's motion to strike Plaintiff's counterstatement of facts (Dkt. 72) is denied, and Defendant's motion for sanctions (Dkt. 86) is denied without prejudice.

---

[1]      Defendant asserts that Plaintiff has improperly sued it as "Wal-Mart Corporation," and its proper name is Walmart, Inc. (*See* Dkt. 1 at 1).

- 1 -

**BACKGROUND**

The following facts are taken from Defendant's Statement of Undisputed Facts (Dkt. 54-1), Plaintiff's response to Defendant's Statement of Undisputed Facts (Dkt. 67), Plaintiff's deposition transcript (Dkt. 55-1), and the exhibits submitted by the parties.

Defendant hired Plaintiff on August 23, 2018, as a part-time hourly sales associate, an entry level position, in Store No. 1619, located at 1200 Marketplace Drive in Rochester, New York 14623. (Dkt. 54-1 at ¶ 4; Dkt. 55-1 at 75). Plaintiff is a black male. (Dkt. 54-1 at ¶ 6). From August 2018, until Plaintiff's termination on September 23, 2020, Plaintiff held the position of sales associate in Walmart's electronics department. (*Id*. at ¶ 7). Plaintiff earned $11.90 per hour at the time he was hired, and he received pay increases during his tenure at Walmart, which in February 2020 had increased to $14.80 per hour. (*Id*. at ¶¶ 9-10). At the time of Plaintiff's termination, the store manager was Nathaniel Sharp. (*Id*. at ¶ 12).

According to Defendant, it strives to provide a workplace that is free from unlawful discrimination and harassment, and it maintains a strong discrimination and harassment prevention policy, which details prohibited conduct, including but not limited to discrimination or harassment based on race. (*Id*. at ¶ 13). Defendant further assures its employees that retaliation of any kind against anyone who reports conduct that violates the policy, cooperates in an investigation, or opposes discrimination or harassment, is strictly prohibited. (*Id*. at ¶ 15). The policy details the various avenues available for employees to report alleged discrimination or harassment, and all complaints are kept confidential to the extent possible. (*Id*. at ¶¶ 16, 19). Plaintiff was aware of these policies. (*Id*. at ¶ 20).

Although he was hired as a part-time associate, Plaintiff worked close to full-time hours on a consistent basis from 2018 through March of 2019. (*Id*. at ¶ 40). On March 4, 2019, Plaintiff alleges he signed a "Full-Time/Part-Time Classification Change: Associate Acknowledgement," which indicated that Plaintiff had been working more hours on average than his part-time classification and therefore would be classified as full-time, effective March 4, 2019. (*Id*. at ¶ 44). The acknowledgment further provided that all hourly associates are required to work the appropriate number of hours to maintain a full-time classification. (*Id*. at ¶ 45; *see also* Dkt. 54-3 at ¶¶ 7-8 (declaration of Christine Dunman, Market Human Resources Manager for Walmart, explaining that the acknowledgement is signed by an employee "to acknowledge a change in their classification to reflect the number of hours they are working on average," and "further provides that all hourly associates are required to work the appropriate number of hours to maintain their classification")).

Plaintiff acknowledged that although he had been working "about full-time hours" from 2018 until March of 2019, his hours decreased in March 2019. (Dkt. 54-1 at ¶ 46; *see also* Dkt. 55-1 at 23-24). Plaintiff further admitted that once he raised the issue to management, he was offered the opportunity to work more hours by working in another department. Plaintiff rejected this offer because he was hired for the electronics department and did not want to work in another department. (Dkt. 54-1 at ¶¶ 47, 49; *see also* Dkt. 55-1 at 93-94). Plaintiff was a part-time employee at the time of his termination. (Dkt. 54-1 at ¶ 50).

Plaintiff claims that he was denied promotions at Walmart based on his race. Plaintiff applied for a department manager position two to three times in 2019 and 2020, with his latest application being in 2020. (Dkt. 54-1 at ¶ 84; Dkt. 55-1 at 62-63). The most recent position was filled in February 2020, by an employee named Savannah Taylor, who is white. (Dkt. 54-1 at ¶ 84; Dkt. 55-1 at 63). Plaintiff was not aware of Savannah's credentials prior to her work at Walmart. (Dkt. 55-1 at 63). Another position was filled by a black male. (*Id*. at 22, 64-65). Plaintiff also testified that he applied for assistant manager positions three times, twice in 2019, and once in January 2020, and he was not interviewed for those positions. (Dkt. 54-1 at ¶ 85; *see also* Dkt. 55-1 at 65-67).

In Fiscal Years 2020 and 2021, Walmart allowed non-exempt hourly employees to participate in a bonus incentive plan. The purpose of the bonus plan was to reward associates if the store met or exceeded predefined business goals. (Dkt. 54-1 at ¶ 54). Payout amounts were calculated based on a set formula that considered the performance of the facility in two categories, and there was also an attendance modifier factored into the payout, based on the associate's number of absences during the applicable period. (*Id*. at ¶ 56). During his employment, Plaintiff received payments under the bonus plan. (*Id*. at ¶ 60). Plaintiff testified that he learned through conversations with his co-workers that he received bonus payouts that were less than his co-workers, but he could not provide specifics or offer any evidence of this alleged pay disparity, nor was he able to explain why he believed that he was paid less due to his race. (*Id*. at ¶ 61; *see also* Dkt. 55-1 at 69-70). In discovery, Plaintiff produced his bonus report for quarter 2 of fiscal year 2021, demonstrating that he was awarded a bonus of $433.61 for that quarter—which was

calculated based on Plaintiff's total hours worked over a 14-week period, multiplied by the corresponding percentages in the two categories, for a subtotal of $346.89, after which an attendance modifier of 125 percent was applied (which is the highest possible modifier, since Plaintiff had no attendance violations during the applicable period), for a total of $433.61. (Dkt. 54-1 at ¶¶ 62-63).

On March 19, 2020, Walmart announced that hourly associates would receive a "special bonus" in the amount of $150 for part-time employees and $300 for full-time employees in gratitude for their work during the Covid-19 crisis. (*Id*. at ¶ 64). Plaintiff received three lump sum payments under this policy. (*Id*. at ¶¶ 65, 67, 69). Plaintiff admitted that he only received $150 because he was considered a part-time employee. (*Id*. at ¶ 70; *see also* Dkt. 55-1 at 94-95).

Defendant also has a disciplinary action policy, detailing Walmart's multilevel, progressive approach to employee accountability. (Dkt. 54-1 at ¶ 22). Under the policy, each instance of employee misconduct is assigned a level of accountability, up to and including termination, based on the severity of the conduct and/or where the employee is in the progressive discipline process. (*Id*.). The first level of accountability is a yellow disciplinary action ("DA1-Yellow"), followed by an orange disciplinary action ("DA2-Orange"), and the final level of accountability before termination is a red disciplinary action ("DA3-Red"). (*Id*. at ¶ 23). The policy provides that an employee "may receive only one of each level of disciplinary action in any 12-month period" and "levels may be skipped based on the circumstances." (*Id*. at ¶ 24). If an employee achieves a DA3-Red and an additional instance of misconduct warranting disciplinary action occurs, the next

level of accountability is termination. (*Id*. at ¶ 25; *see also* Dkt. 54-3 at ¶¶ 18-24). Plaintiff was aware of this policy. (Dkt. 54-1 at ¶ 26).

In the seven months leading up to his termination, Plaintiff achieved the highest-level disciplinary action. (*Id*. at ¶ 29). On March 7, 2020, assistant manager David Shepard gave Plaintiff a DA1-Yellow, for excessive meal violations over a six-month period, noting that Plaintiff "either takes breaks too early or does not take breaks." (*Id*. at ¶ 30). On April 20, 2020, assistant manager Sidney Buongiorno gave Plaintiff a DA2-Orange for leaving a set of electronics keys unattended on the sales floor. (*Id*. at ¶ 31). On July 24, 2020, co-manager Camellia Strader gave Plaintiff a DA3-Red for unsafe work practices and poor business judgment, after he led an angry customer to the assistant manager's office, a restricted area, rather than calling for assistance in accordance with established store procedure. (*Id*. at ¶ 32). Upon receiving a disciplinary action, associates are given an opportunity to electronically submit their own comments regarding the issued discipline, and in response to his July 24, 2020 DA3-Red disciplinary action, Plaintiff commented: "From now on I will try not to bring anyone to the backroom." (*Id*. at ¶ 35; *see also* Dkt. 54-3 at ¶¶ 25-27).

On September 23, 2020, Plaintiff's employment was terminated by Mr. Sharp for "poor customer service which resulted in a misconduct with coachings." (Dkt. 54-1 at ¶ 36). Mr. Sharp would have seen on the workday application that Plaintiff was on a DA3-Red disciplinary action and did not have room for any additional disciplinary actions and, as such, Mr. Sharp correctly terminated Plaintiff's employment pursuant to Walmart's disciplinary action policy. (*Id*. at ¶¶ 37-38; *see also* Dkt. 54-3 at ¶¶ 28-30).

Plaintiff testified at his deposition about alleged discrimination and retaliation he experienced while working for Defendant.  Plaintiff complained in December 2018 about an individual named Ben Fisher, who Plaintiff alleges denied a black woman the "lower price" on a landline telephone, while he observed white individuals receive the lower price when an item was placed in the wrong location.  (Dkt. 55-1 at 25-26).  But Plaintiff could not provide specific details regarding his observations of white people receiving the lower price under the same circumstances (but testified that he saw this occur "dozens" of times per month), nor could Plaintiff identify a company policy that when an item is placed on the wrong shelf, the customer is entitled to the price marked on the shelf, rather than the item's listed price.  (*Id*. at 27, 41-42).  Plaintiff also complained of an occasion in early December 2018, when a box of DVDs was missing, and Mr. Fisher became agitated and stated, "what do you expect from working with people of color."  (*Id*. at 48).  Plaintiff understood Mr. Fisher to be accusing him of stealing DVDs because he was black.  (*Id*. at 49).  Plaintiff stated that these instances with Mr. Fisher occurred in 2018.  (*Id*. at 52).

Plaintiff testified that another employee, Doug Townsend, said "colored people, they come here just to collect checks.  They don't work.  They don't deliver."  (*Id*. at 72).  Plaintiff further testified that on September 1, 2020, Mr. Townsend accused Plaintiff of stealing a bottle of water.  (*Id*. at 74).

Plaintiff asserts that his locker was "cut" because of a report that someone had drugs and was stealing.  Plaintiff contends that this action was discriminatory, but Plaintiff further testified that he did not know if anyone else's locker was cut.  (*Id*. at 76).  Plaintiff stated that he could not recall whether he complained about the locker cutting under the ethics

policy, but that he sent an email to Tim Bernard, Defendant's regional market director, about the alleged discrimination. (*Id*. at 77-79). Plaintiff did not mention anything about his race in his email, because he was afraid of retaliation, but he wanted to make that report in-person, so that Mr. Bernard could read his facial expression and his anger about the situation. (*Id*. at 80-81).

Plaintiff also testified that he was followed to the bathroom and taken to the back of the dumpster by the unloading truck area. (*Id*. at 84-85). In 2019, Mr. Fisher and a person named Mike pinned him down against the wall, and told him that he could not ask customers about override price, and if he did he would be terminated. (*Id*.). Plaintiff further testified that his name was removed from the birthday bulletin board. (*Id*. at 89).

Plaintiff claims that he was denied a full-time contract due to his race. (*Id*. at 67). When pressed as to why he believed he was denied certain benefits due to his race, Plaintiff stated, "I don't know if that has to do with race but that's how I feel," and that he did not know that it was because of his race but that was just his "understanding." (*Id*. at 67-68; *see also* Dkt. 54-1 at ¶ 51). Plaintiff was not aware of any other black employees who were not receiving benefits to which they were entitled. (Dkt. 55-1 at 73). Plaintiff agreed that certain employees received more benefits than he did, since they were full-time employees and worked more hours than him. (*Id*. at 75-76). Plaintiff testified that Defendant owed him a contractual obligation to provide him with full-time benefits. (*Id*. at 98).

## PROCEDURAL HISTORY

Plaintiff filed his complaint in the Supreme Court of the State of New York, County of Monroe, on March 3, 2023. (Dkt. 1-2). On March 29, 2023, Defendant removed the case to the United States District Court for the Western District of New York, based on diversity jurisdiction, and in the alternative, federal question jurisdiction. (Dkt. 1 at ¶¶ 10-16). Defendant answered the complaint on February 2, 2024 (Dkt. 12), and the case was referred to the Hon. Mark W. Pedersen, United States Magistrate Judge, for supervision of discovery (Dkt. 13).

Defendant filed its motion for summary judgment on June 20, 2025. (Dkt. 54; Dkt. 55). After receiving extensions of time (Dkt. 57; Dkt. 63), Plaintiff filed his response on October 31, 2025 (Dkt. 67).[2] Plaintiff subsequently filed additional exhibits in support of his response papers on November 21, 2025 (Dkt. 70), and on January 15, 2026 (Dkt. 82). On December 1, 2025, Defendant filed its reply papers in further support of its motion for summary judgment. (Dkt. 71). That same day, Defendant filed a motion to strike Plaintiff's counterstatement of undisputed facts. (Dkt. 72). On January 5, 2026, Plaintiff filed a response to the motion to strike, as well as an unauthorized sur-reply in opposition to Defendant's motion for summary judgment. (Dkt. 79; Dkt. 80). Defendant filed reply

---

[2]    Plaintiff also filed a motion for leave to file excess pages on December 18, 2025. (Dkt. 76). Defendant opposes Plaintiff's request. (Dkt. 77). Plaintiff's letter request is unclear as to whether he seeks to file excess pages in connection with his response to the motion for summary judgment or his response to the motion to strike. Despite that the request is not clear, given Plaintiff's *pro se* status, the Court grants Plaintiff's request to the extent that the Court has reviewed and considered the entirety of Plaintiff's papers in resolving the pending motions.

papers in further support of the motion to strike on January 12, 2026.  (Dkt. 81).  Plaintiff

filed an unauthorized sur-reply in further opposition to the motion to strike on January 15,

2026.  (Dkt. 83).  Plaintiff also filed a handwritten letter on that same date, which is

somewhat illegible but appears to state that he is caring for his sick mother.  (Dkt. 84).  An

accompanying docket notation indicates that Plaintiff would be out of the country visiting

his mother.   Thereafter, on March 16, 2026, Defendant filed a motion for sanctions

pursuant to Rule 11 of the Federal Rules of Civil Procedure, arguing that Plaintiff should

be subject to sanctions for making frivolous and untimely filings.  (Dkt. 86).

## DISCUSSION

### I.    Legal Standard for Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment

should be granted if the moving party establishes "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  The Court should grant summary judgment if, after considering the evidence in

the light most favorable to the nonmoving party, the Court finds that no rational jury could

find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as

to any material fact. . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486

(2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the

party moving for summary judgment may meet its burden by showing the evidentiary

materials of record, if reduced to admissible evidence, would be insufficient to carry the

non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358.  Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.     Plaintiff's Submissions and Defendant's Motion to Strike (Dkt. 72)

Plaintiff's response in opposition to Defendant's motion for summary judgment is comprised of an 88-page response to Defendant's statement of facts (Dkt. 67), over 450 pages of exhibits, some of which were untimely filed (Dkt. 67-1; Dkt. 70; Dkt. 82), a 22-page declaration wherein Plaintiff lists his 189 exhibits (Dkt. 67-2), and a 73-page memorandum of law (Dkt. 67-3).  Defendant has moved to strike Plaintiff's opposing statement of undisputed facts because it does not comply with Rule 56(a) of this Court's Local Rules of Civil Procedure, which requires that an opposing statement:

> shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs. Each numbered paragraph in the moving party's statement of material facts may be deemed

- 11 -

admitted for purposes of the motion unless it is specifically controverted by correspondingly numbered paragraphs in such opposing statement with citation to admissible evidence or to evidence that can be presented in admissible form at trial as required by Fed. R. Civ. P. 56(c)(1)(A).   In addition, when appropriate, the opposing party's statement may also contain a short and concise statement, in numbered paragraphs, of additional material facts (i) as to which the opposing party contends there is no genuine issue to be tried; and/or (ii) that the opposing party contends are in dispute.

L. R. Civ. P. 56(a)(2); *see also* Dkt. 72 (Defendant's motion to strike).  Plaintiff has also

submitted an unauthorized sur-reply in opposition to Defendant's motion for summary

judgment. (Dkt. 80).

The Court turns first to Defendant's motion to strike.  The Court has reviewed

Plaintiff's opposing statement of facts, which is an 88-page response to Defendant's 21-

page statement of facts.  In many instances, Plaintiff's opposing statements lack citation to

admissible evidence (or any evidence) in the record, and some statements include incorrect

internal references.  (*See, e.g.*, Dkt. 67 at ¶¶ 11, 23-24, 26-29, 34-35, 37, 39, 41-42, 44-45).

Other statements fail to respond to the specific facts raised in Defendant's statement but

rather state Plaintiff's opinion on Defendant's policies and practices.  In other words, most

of Plaintiff's opposing statement is an unsworn personal narrative that largely fails to

specifically respond to Defendant's factual statements.

Given the deficiencies with Plaintiff's opposing statement, the Court may deem

Defendant's well-supported statement of facts admitted by Plaintiff.  *See* L. R. Civ. P.

56(a)(2); *see also N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*,

426 F.3d 640, 648-49 (2d Cir. 2005) ("district courts have the authority to institute local

rules governing summary judgment submissions" although "[r]eliance on a party's

statement of undisputed facts may not be warranted where those facts are unsupported by the record"). Considering Plaintiff's *pro se* status, the Court has conducted an independent review of the record to ascertain whether disputes of material fact exist that would preclude summary judgment in favor of Defendant. *See Daley v. Cablevision Sys. Corp.,* No. 12-cv-6316 (NSR), 2016 WL 880203, at *1 (S.D.N.Y. Mar. 7, 2016), *aff'd*, 675 F. App'x 97 (2d Cir. 2017). In other words, while the Court could strike Plaintiff's opposing statement, given his *pro se* status it will not do so. Defendant's request that the Court strike the entirety of Plaintiff's opposing statement of facts and pages 26 through 69 of Plaintiff's memorandum of law (Dkt. 72) is denied. The Court has reviewed and considered Plaintiff's submissions in opposition to summary judgment, his complaint, and his deposition testimony to determine whether there are disputed issues of material fact.

The Court turns next to the lack of a sworn statement from Plaintiff regarding his claims. Despite Plaintiff's voluminous filings, he has failed to submit his own sworn statement disputing Defendant's factual contentions. When Defendant filed its motion for summary judgment, the Court set a scheduling order wherein Plaintiff was advised that "THE CLAIMS PLAINTIFF ASSERTS IN HIS COMPLAINT MAY BE DISMISSED WITHOUT A TRIAL IF HE DOES NOT RESPOND TO THIS MOTION by filing his own sworn affidavits and other papers as required by Fed. R. Civ. P. 56(c)," and also that "[a]ny witness statements, which may include Plaintiff's own statements, must be in the form of sworn affidavits (or declarations)." (*See* Dkt. 56). Defendant also served and filed with its motion the required "Notice to Pro Se Litigant Regarding Rule 56 Motions for

Summary Judgment," which includes the same instructions. (*See* Dkt. 54-7 at ¶ 3; Dkt. 54-8).

Despite being advised on multiple occasions that he is required to submit proof in admissible form in opposition to summary judgment, Plaintiff has not submitted his own affidavit disputing Defendant's factual contentions.[3]  Plaintiff also has not submitted any witness affidavits supporting his version of events.  While the Court is obliged to afford *pro se* litigants some leniency, *pro se* litigants are nevertheless required to comply with the Court's procedural rules.  *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir. 2006) (noting that a litigant's *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law" (citation omitted)).  Here, Plaintiff was advised that he was required to submit more than unsubstantiated allegations and that his statements "must be in the form of sworn affidavits," or his claims could be dismissed.  The only sworn statement from Plaintiff before the Court is his deposition testimony, which the Court has reviewed to determine whether there are disputed issues of material fact.

Finally, the Court notes that Plaintiff has submitted over 450 pages of exhibits in opposition to Defendant's summary judgment motion (Dkt. 67-1; Dkt. 70; Dkt. 82), many of which were untimely filed, despite Plaintiff being granted multiple extensions of time to file his response papers.  Many of the exhibits, which are comprised of printouts of text messages, e-mails, photographs of computer screens, pieces of paper, and receipts,

---

[3]     Plaintiff has submitted a declaration in opposition to Defendant's motion, but the declaration simply lists his 190 exhibits. (Dkt. 67-2).  It does not include a factual recitation of Plaintiff's version of events or otherwise dispute the facts as presented by Defendant.

photographs of Walmart displays, and Plaintiff's own notes, do not appear to be related to Plaintiff's claims, or they are illegible. (*See, e.g.*, Dkt. 70 at 28, 44, 46, 57, 59, 75, 77). Of the exhibits that do appear to be related to Plaintiff's claims, many are unauthenticated or constitute inadmissible hearsay. *See Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 395 (D. Conn. 2008) (explaining that on summary judgment, affidavits shall be made on personal knowledge, the principles governing admissibility of evidence do not change on a motion for summary judgment, and documents submitted that include inadmissible hearsay or conclusory statements, are incomplete, or have not been properly authenticated, may be disregarded by the court), *aff'd*, 587 F.3d 132 (2d Cir. 2009). The Court has considered Plaintiff's exhibits to the extent they are admissible evidence.

## III.    Defendant's Motion for Summary Judgment (Dkt. 54)

### A.    Plaintiff's Discrimination Claims[4]

#### 1.    Time-Barred New York State Human Rights Law (NYSHRL) Claims

Defendant first argues that many of Plaintiff's allegations are time-barred by the three-year statute of limitations for NYSHRL claims. (Dkt. 54-2 at 10-14).  Discrimination claims brought pursuant to the NYSHRL are subject to a three-year statute of limitations. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997); *Urquhart v. Metropolitan Transp. Auth.*, 975 F. Supp. 2d 320, 331 (S.D.N.Y. 2013).  Plaintiff filed his case on March 3, 2023, and therefore only events occurring after March 3, 2020, are actionable under the NYSHRL.

Plaintiff alleges that Defendant failed to promote him when he was passed over for team leader and assistant manager positions in 2019 and 2020.  To establish a *prima facie* case of a discriminatory failure to promote, a plaintiff must establish that (1) he is a member

---

[4]    Plaintiff has not specifically identified the statutes pursuant to which he brings his claims (*see* Dkt. 1-2), and in response to Defendant's motion, Plaintiff does not assert that he brings his claims under Title VII.  The Court notes that it appears that Plaintiff failed to exhaust his administrative remedies to assert claims under Title VII (*see* Dkt. 54-2 at 15 n.2), and the Court has not identified any right-to-sue letter issued by the Equal Employment Opportunity Commission in the record before it.  Because "[i]t is well established that Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court," *see Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015), and given his *pro se* status, the Court construes Plaintiff's discrimination claims as brought pursuant to the New York Human Rights Law.  The Court further notes that the standard for discrimination claims brought pursuant to the NYSHRL is generally more lenient for plaintiffs, and therefore even if Plaintiff had exhausted his administrative remedies and asserted claims under Title VII, those claims would not survive summary judgment for the reasons discussed herein.

of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998). Setting aside that there is no proof that Plaintiff was qualified for these positions or that he was denied the positions due to his race (and in fact, one position was given to another black male), Plaintiff's claim that Defendant failed to promote him is untimely. Plaintiff's most recent application for a team leader position was in January 2020, and the position was filled by February 2020. (Dkt. 54-13 at 52; *see also* Dkt. 54-12 at 139 (promotion announcement for Savana Taylor-Larzelere, dated February 20, 2020)). Accordingly, the alleged denial of a promotion, even if discriminatory, is barred by the applicable statute of limitations.

Plaintiff also claims that he was passed over for an assistant store manager position. This claim is also untimely because Plaintiff's most recent application for an assistant store manager position was in January 2020, which is again outside the relevant limitations period. (*See* Dkt. 55-1 at 65-66; Dkt. 54-19 at 25 (listing application date of January 2020, with another candidate selected on January 30, 2020)). Plaintiff has failed to dispute Defendant's evidence on this issue. Accordingly, Plaintiff's claim based on Defendant's alleged failure to promote him is dismissed as untimely.

Plaintiff also claims that he was discriminated against when Walmart did not give him full-time benefits, relying on the full-time employee acknowledgement. This claim is also untimely because the events occurred in 2019. Plaintiff claims that in March 2019, he signed a full-time acknowledgement form and then did not receive appropriate benefits,

and that this was due to his race.  Even if this claim was timely, it lacks merit, because Plaintiff fails to offer any evidence beyond his "feeling" that he was denied benefits due to his race.  (*See* Dkt. 55-1 at 67-68 (Plaintiff's testimony that he did not know if he was denied benefits based on his race, but it was "just how I feel")).  As explained above, Plaintiff has failed to submit an affidavit explaining why he believed he was denied benefits due to his race, and his conclusory assertion that it was "just how he felt," is not sufficient to defeat summary judgment.

Although not alleged specifically in his complaint, based on his deposition testimony, Plaintiff appears to claim he was subjected to a hostile work environment, principally based on alleged discriminatory actions taken by his supervisor, Mr. Fisher, in 2018 and 2019.  Again, these actions are outside the limitations period.  Mr. Fisher no longer supervised Plaintiff after September 2019, at which point Plaintiff was supervised by Brittany Lu and Judah Dane.  (Dkt. 55-1 at 21-22; *see also id.* at 52 (Plaintiff's testimony that his complaints about Mr. Fisher "all . . . happened in 2018")).  Plaintiff does not claim that he made any complaints about Ms. Lu or Mr. Dane.

To the extent Plaintiff argues that the Court should consider any pre-March 2020 acts based on a continuing violation theory, any such argument fails.  "The continuing violation doctrine . . . delays triggering of the statute of limitations period for a hostile work environment claim until the last discriminatory act in furtherance of the hostile work environment occurs, i.e. when the claim accrues."  *Carter-Marks v. Alstrom Transp. USA Inc.*, 800 F. Supp. 3d 423, 451 (E.D.N.Y. 2025).  "In order for a timely incident to prolong a hostile work environment created by earlier action, the timely incident must be

sufficiently related to the prior events so that they can be said to be part of the 'same' hostile work environment." *Sanderson v. N.Y.S. Elec. & Gas Corp.*, 560 F. App'x 88, 91 (2d Cir. 2014). Plaintiff's initial complaints of discrimination involved alleged acts and statements by Mr. Fisher who, as explained above, was no longer Plaintiff's supervisor starting in September 2019, and Plaintiff raises no complaints regarding Ms. Lu and Mr. Dane. In other words, the alleged acts taken by Mr. Fisher in 2018 and 2019 did not continue into the relevant limitations period. Plaintiff offers no evidence supporting that the instances of alleged discriminatory acts that took place within the statute of limitations were related to those that took place in 2018 and 2019. Further, failure to promote claims are "discrete acts," and generally are not subject to the continuing violation doctrine. *See Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 299 (S.D.N.Y. 2012).

Plaintiff makes four allegations that fall within the NYSHRL's statute of limitations, including: (1) Plaintiff was written up for leaving a set of electronics keys unattended on the sales floor; (2) Plaintiff's birthday was excluded from the birthday board; (3) Plaintiff's co-worker accused him of stealing a bottle of water; and (4) Plaintiff was followed throughout the store. None of these claims—either taken together or standing alone—meet the threshold for a hostile work environment under the NYSHRL, which requires a showing that the plaintiff's "employer treated [him] less well than other employees, *at least in part for a discriminatory reason*." *Kittle v. Mavis Discount Tire, Inc.*, No. 2:24-cv-2537(NJC) (AYS), 2025 WL 2721620, at *9 (E.D.N.Y. Sept. 24, 2025) (emphasis

- 19 -

added)).[5]  Here, Plaintiff has failed to offer evidence that any actions taken against him were due to his race.  Plaintiff has also failed to identify any comparators—in other words, people outside his class who were treated differently.  And in fact, Plaintiff conceded at his deposition that he did not actually know if these actions were taken against him due to his race.  (*See, e.g.,* Dkt. 55-1 at 87 (Plaintiff's testimony that he did not know if he was being followed around the store due to his race)).

For those reasons, Defendant is entitled to summary judgment on Plaintiff's discrimination claims based on events that transpired before March 3, 2020, because any such claims are time-barred.  Further, to the extent Plaintiff asserts a hostile work environment claim based on events occurring after March 3, 2020, Defendants are also entitled to summary judgment on those claims.

### 2.  Plaintiff's Termination

Defendant next argues that Plaintiff has failed to show that he was terminated due to his race.  (Dkt. 54-2 at 15).  In response, Plaintiff argues that he did "what was asked and even went the extra mile for a customer."  (Dkt. 67-3 at 51).

To establish a *prima facie* case of race discrimination under the NYSHRL, a plaintiff must prove that: (1) he was within the protected class, (2) he was qualified for the

---

[5]      On October 11, 2019, the NYSHRL was amended with respect to hostile work environment claims to remove the "severe or pervasive" requirement.  It is unclear whether the standard for a NYSHRL hostile work environment claim is co-extensive with a claim under the NYCHRL, but "district courts have generally agreed that the amended NYSHRL standard is, at the very least, closer to the NYCHRL standard—which requires only that the plaintiff's employer treated [him] less well than other employees, at least in part for a discriminatory reason." *Kittle*, 2025 WL 2721620, at *9 (quotations and citation omitted).

position and was satisfactorily performing his duties, (3) he was subject to an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).  Once the plaintiff has established a *prima facie* case, the burden shifts back to the defendant to "offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct."  *Harlow v. Molina Healthcare, Inc.*, 723 F. Supp. 3d 116, 126 (N.D.N.Y. 2024).  "Once the defendant makes that showing, the burden returns to the plaintiff to demonstrate that defendant's reason is pretext for discrimination."  *Id*.  It is well-settled that termination would constitute an adverse employment action.  *Yoselovsky v. Assoc. Press*, 917 F. Supp. 2d 262, 273 (S.D.N.Y. 2013).

However, Plaintiff has failed to demonstrate that his termination occurred under circumstances giving rise to an inference of discrimination.  For example, Plaintiff has failed to offer evidence that Mr. Sharp, the individual who fired him, held any retaliatory animus against him (rather, the evidence before the Court demonstrates that Plaintiff received progressive discipline from three different supervisors, undercutting any claim of discriminatory animus), that a comparator outside of his protected class was treated differently than he was during the disciplinary process, or that he was replaced by an individual outside his protected class.

Even if Plaintiff had come forward with evidence that he was terminated under circumstances giving rise to an inference of discrimination, Defendant has offered a legitimate, non-discriminatory reason for Plaintiff's termination—that is, Plaintiff was subject to progressive discipline under Walmart's disciplinary policy due to various

infractions in the workplace, which ultimately led to his termination under the policy. Defendant submits a sworn statement from Ms. Dunman, Market Human Resources Manager for Walmart Store 1619, on Marketplace Drive in Rochester. (Dkt. 54-3). The declaration outlines Plaintiff's work history at Walmart, Defendant's disciplinary policy, and that Plaintiff was terminated pursuant to the disciplinary policy after receiving three warnings over a one-year period. (*See id*. at ¶¶ 6, 9, 18-24; *id*. at ¶¶ 28-29 (explaining that "[a]ccording to Walmart business records, on September 23, 2020, Mr. Sharp terminated Mr. Kassaw's employment for "poor customer service which resulted in a misconduct with coachings," and "[a]t the time of Mr. Kassaw's termination, Mr. Sharp would have seen that Mr. Kassaw was on a DA3-Red coaching and did not have room for any additional disciplinary actions")); *see, e.g., Shumway v. UPS, Inc.*, 118 F.3d 60, 65 (2d Cir. 1997) (violation of company policy constitutes a legitimate, non-discriminatory reason for termination); *Douglas v. Hip Centralized Lab. Servs., Inc.,* No. 03-CV-205 (SLT)(LB), 2005 WL 1074959, at *5 (E.D.N.Y. Apr. 29, 2005) ("Defendant's belief that Plaintiff violated company policy . . . constitutes a legitimate, nondiscriminatory reason for terminating Plaintiff's employment."). Plaintiff does not dispute that he received these disciplinary infractions.

As noted above, Plaintiff has failed to submit any admissible proof—such as his own sworn statement or a witness statement—disputing Ms. Dunman's assertions regarding his termination, or demonstrating that his termination was a pretext for race discrimination. Plaintiff's arguments in his memorandum of law are not sufficient to defeat summary judgment. *See Lynch v. Nat'l Fuel Gas Distrib. Corp.*, 25 F. Supp. 3d 358, 366

(W.D.N.Y. 2014) (noting that "[a]lthough direct evidence of discriminatory motive is not necessary to survive summary judgment, plaintiff must produce at least some circumstantial evidence that shows discriminatory animus," and "even where a *prima facie* case is established, conclusory assertions of discrimination are insufficient to create an issue of material fact as to pretext" (citing *Dister v. Cont'l Grp., Inc.,* 859 F.2d 1108 (2d Cir. 1988)).  Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for wrongful termination.

### 3.  Retaliation Claims

Defendant argues that it is entitled to summary judgment on Plaintiff's retaliation claim, including because Plaintiff has failed to proffer any evidence of protected activity. (Dkt. 54-2 at 21).   In response, Plaintiff argues generally that Defendant "gave [a] misleading reason for the wrongful termination."  (Dkt. 67-3 at 56).

The burden-shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to NYSHRL retaliation claims.  *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025).  A plaintiff claiming retaliation pursuant to the NYSHRL must demonstrate that he "took an action opposing h[is] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Id*.  "If the plaintiff establishes a prima facie case of retaliation . . . the defendant then has the opportunity to offer legitimate reasons for its actions.  If the defendant articulates a non-discriminatory basis for the adverse employment action, the burden shifts back to the plaintiff to show either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking

action, and that its conduct was based at least in part on discrimination." *Id*. (citations and quotations omitted).

Plaintiff identifies two instances that could be construed as engaging in protected activity. First, Plaintiff stated that he made complaints via email to Mr. Bernard. (*See* Dkt. 55-1 at 77-79). Plaintiff testified that he did not mention anything about his race in his email to Mr. Bernard and that he wanted to speak to him in person. (*Id*. at 80-81). Plaintiff provided a copy of this email in discovery, which is dated September 21, 2019, and confirms that Plaintiff did not complain about his race—rather, he stated that he had been "subjected to inappropriate (or unacceptable behavior) and verbal abuse especially when [he] sp[oke] out about unfair treatment of customers and employees by executives." (*See* Dkt. 54-12 at 99-100).

Because Plaintiff concedes he did not mention race, discrimination, or harassment in his email to Mr. Bernard, his employer could not have reasonably understood that Plaintiff was complaining of discrimination based on his protected characteristic—in this case, his race. *See, e.g., Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013); *see also Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) ("Mere complaints of unfair treatment . . . are not protected speech in the employment retaliation context, and the onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." (citation and quotations omitted)); *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434,

- 24 -

448 (S.D.N.Y. 2011) ("An employee engages in a protected activity when she complains of an employment practice that she reasonably believes violates the law.").

Further, even if Plaintiff Defendant understood Plaintiff's September 2019 complaint to be about race discrimination, there is a lack of causal connection between Plaintiff's complaint and his termination one year later in September 2020—especially because Plaintiff accrued three disciplinary infractions between the complaint and his firing. *See Gonzalez v. City of N.Y.*, 442 F. Supp. 3d 665, 688-89 (S.D.N.Y. 2020) (explaining that courts in the Second Circuit have consistently held that the passage of two to three months between protected activity and an adverse employment action does not allow for an inference of causation, and the six months that had passed between protected activity and failure to promote did not support a causal relationship), *aff'd*, 845 F. App'x 11 (2d Cir. 2021); *see also Ebadi v. Diamond Standard Inc.*, No. 1:24-cv-00103 (JLR), 2026 WL 591569, at *12 (S.D.N.Y. Mar. 3, 2026) ("The record evidence . . . does not support an inference of causation based on the temporal proximity between [the plaintiff's] complaints and the termination of her employment because her own intervening misconduct severs the chain of causation." (quotations and citation omitted)).

Second, Plaintiff claims that he filed a complaint of discrimination with Walmart's global ethics department. Defendant was unable to identify the complaint until Plaintiff provided an internal reference number during discovery, after which Defendant found a June 2020 complaint made to global ethics, which Plaintiff had made anonymously. (*See* Dkt. 54-7 at ¶ 16; Dkt. 54-21 (Ethics Case Management Details for WMT200605699)). The fact that Plaintiff made this complaint anonymously undercuts the requirement of a

retaliation claim that the defendant is aware of the plaintiff's protected activity. *See, e.g., Wilson v. Lenox Hill Hosp./Northwell Health*, No. 19-CV-5537 (AMD) (LB), 2019 WL 6726304, at *3 (E.D.N.Y. Dec. 11, 2019) ("[E]ven if the anonymous complaint to the sexual harassment hotline constituted protected activity, it could not form the basis of a retaliation claim because her employer would not have known who made the complaint."). The global ethics complaint was closed since there was "no reporter contact information" and "no subject name." (Dkt. 54-21 at 3).

Even if Plaintiff could establish a *prima facie* case of retaliation for either of his complaints, as further discussed above, Defendant has offered a legitimate reason for Plaintiff's termination—namely, because he had accrued three disciplinary infractions and was terminated pursuant to Defendant's disciplinary policy. Other than offering generalized denials that Defendant's reason for terminating him was misleading and his termination was retaliatory, Plaintiff does not rebut Defendant's evidence by showing that its reasoning was pretextual. Rather, the evidence before the Court is that Mr. Sharp terminated Plaintiff's employment due to Plaintiff's accrued disciplinary infractions and pursuant to Defendant's disciplinary policy, and not in retaliation for any protected activity. (*See* Dkt. 54-3 at ¶¶ 28-30). Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

## B.     Breach of Contract Claim

Defendant next argues that, to the extent Plaintiff asserts a claim for breach of contract, it is entitled to summary judgment because the associate acknowledgement did not contractually bind Walmart to provide Plaintiff with full-time benefits. (Dkt. 54-2 at

23).  Although not specifically asserted as a cause of action in Plaintiff's complaint, Plaintiff testified at his deposition that Defendant breached a contract when it failed to provide him with full-time benefits.  (Dkt. 55-1 at 67; *see also* Dkt. 67-3 at 64).  Plaintiff argues that when he signed the "full-time/part-time classification change associate acknowledgment form" on March 4, 2019, management was obligated to provide him with full-time benefits.  (Dkt. 67-3 at 65).  While Plaintiff acknowledges that he was required to work a certain number of hours to maintain a full-time classification, and that he failed to do so, he argues that "the upper management team" should have scheduled him the appropriate number of hours so that Plaintiff could maintain his full-time classification. (*Id.*).

"Under New York law, a breach of contract claim has four elements: (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."  *First Inv'rs Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998). As explained in Ms. Dunman's declaration, the "Full-Time/Part-Time Classification Change: Associate Acknowledgement," is provided to an employee working more or less hours on average than their current classification.  (Dkt. 54 at ¶ 7).  An employee signs this document to acknowledge a change in their classification to reflect the number of hours they are working on average, and the acknowledgement further provides that all hourly associates are required to work the appropriate number of hours to maintain their classification.  (*Id.* at ¶ 8).

Even if Plaintiff had offered evidence that the employee acknowledgment is a contract whereby Defendant was obligated to provide him with full-time benefits—which

he has not[6]—Plaintiff failed to perform his part of the bargain by working the appropriate number of hours to maintain his full-time classification. (*See* Dkt. 54-3 at ¶ 8 ("The Acknowledgment further provides that all hourly associates are required to work the appropriate number of hours to maintain their classification.")). The evidence submitted by Defendant is that it offered Plaintiff the opportunity to work full-time hours, including by giving Plaintiff the opportunity to be "secondaried as a cashier." Defendant also offered Plaintiff that it could "secondary [him] in other parts of the store so [he] could pickup hours." (Dkt. 54-1 at ¶ 48; Dkt. 54-12 at 35-36). Plaintiff does not dispute that Defendant offered him opportunities to work more hours or that he refused those opportunities. (Dkt. 55-1 at 90-91 (Plaintiff's agreement that he turned down Defendant's offer to work more hours)).

Accordingly, because Plaintiff has failed to establish that the employee acknowledgment was a contract between himself and Defendant, and he has also failed to offer evidence countering Defendant's assertion that Plaintiff failed to maintain his full-time classification, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

### C.    Unpaid Wages Claim

Defendant lastly argues that, to the extent Plaintiff asserts a claim for unpaid wages, any such claim fails because Plaintiff was paid all amounts due to him under the subject

---

[6]    Plaintiff has attached what appears to be a photograph of the acknowledgment to his motion papers (*see* Dkt. 70 at 392), but it is very poor quality and not all the wording is readable.

bonus programs.  (Dkt. 54-2 at 25).  In response, Plaintiff asserts that he and his associates devoted himself to customers and his community by putting himself at risk during the pandemic, that upper management was ungrateful for their hard work, and he should have received payout amounts of $300 per month in March, June, and August of 2020, instead of $150 for each of those months.  (Dkt. 67-3 at 68).

Section 193 of the New York Labor Law prohibits employers from taking "any deduction from the wages of an employee," except as specifically authorized under the statute.  N.Y. Lab. Law § 193(1).  However, a plaintiff "cannot assert a statutory claim for wages under the Labor Law if he has no enforceable contractual right to those wages." *O'Grady v. BlueCrest Cap. Mgmt. LLP*, 646 F. App'x 2, 4 (2d Cir. 2016) (quoting *Tierney v. Capricorn Investors, L.P.*, 189 A.D.2d 629, 632 (1st Dep't 1993)).  As explained below, Plaintiff has failed to articulate any violation of the Labor Law by Defendant's payment of bonuses—rather, he simply offers his opinion that he should have received higher payments under the plan.

The evidence before the Court is that in 2020 and 2021, Walmart allowed hourly employees to participate in a bonus plan.  (Dkt. 54-1 at ¶ 54).  The bonus payments were discretionary, and they were calculated based on a set formula that considered the performance of the store, including "store sales" and "store clean, fast, and friendly."  (*Id.* at ¶ 56).  Plaintiff received several payments under the plan.  (*Id.* at ¶ 60).  Defendant has submitted evidence as to how these payments were calculated (*see id.* at ¶ 63), and Plaintiff has failed to dispute this evidence.  Further, given that the bonuses were discretionary, they do not fall under the Labor Law's definition of wages, and they cannot form the basis for

- 29 -

a claim under the New York Labor Law. *See Apple Mortgage Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 292 (S.D.N.Y. 2016) ("Because the bonuses were discretionary, the bonuses do not fall within the meaning of wages under New York Labor Law § 190(1)").

Plaintiff has also raised an issue concerning the Covid-19 special bonuses that Walmart paid to employees during the pandemic. Specifically, Walmart announced that hourly associates would receive bonuses in the amount of $150 for part-time employees, and $300 for full-time employees. (Dkt. 54-1 at ¶ 65). Plaintiff received several bonuses under this bonus plan. (*Id*. at ¶¶ 67-69). Plaintiff fails to offer any evidence disputing these facts—rather, he states his opinion that he should have received the full-time bonuses. (Dkt. 67-3 at 68). However, Plaintiff's opinion in his memorandum of law, and without citation to admissible evidence, is not sufficient to defeat support summary judgment on his claims. In fact, Plaintiff admits that he received payments of $150 (as opposed to $300 for full-time employees) under the bonus plan because he was considered a part-time employee. (Dkt. 54-1 at ¶ 70; Dkt. 55-1 at 94-95; *see also* Dkt. 54-3 at ¶ 9 (according to Walmart business records, Plaintiff was a part-time employee at the time of his termination)). Accordingly, Defendant is entitled to summary judgment based on any claim Plaintiff brings for unpaid bonuses under the New York Labor Law.

## IV.    Defendant's Motion for Sanctions (Dkt. 86)

Lastly, the Court turns to Defendant's motion for sanctions. Defendant filed a motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure on March 16, 2026. (Dkt. 86). In support of its motion for sanctions, Defendant argues that Plaintiff made several improper and untimely filings before the Court that Defendant has had to

oppose. (*Id.* at 5-9). Defendant also identifies filings by Plaintiff in January 2026, including an unauthorized sur-reply Plaintiff filed on January 5, 2026, wherein Plaintiff appeared to use artificial intelligence to present "hallucinated cases" and made misstatements of fact. (*Id.* at 5, 9-13). Defendant requests that the Court issue an order striking the January 2026 filings, award Defendant reasonable attorney's fees and costs incurred in drafting and filing the motion for sanctions, as well as any other sanctions the Court deems appropriate to deter similar conduct in the future. (*Id.* at 12).

"Rule 11 governs motions for frivolous filings." *Robledo v. Bond No. 9*, 965 F. Supp. 2 d 470, 477 (S.D.N.Y. 2013). A party or counsel for a party is required by the Federal Rules of Civil Procedure to certify that, to the best of their knowledge, the factual contentions made have evidentiary support. Fed. R. Civ. P. 11(b)(3). Rule 11 allows a court to "impose an appropriate sanction on any attorney, law firm, or party that violated [Rule 11(b)] or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Sanctions may be—but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) (citation omitted). "When deciding whether to grant Rule 11 sanctions, the Court applies an objective standard of reasonableness, and looks to, among other factors, whether the party acted in bad faith; whether they relied on a direct falsehood; and whether the claim was utterly lacking in support." *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 526 (S.D.N.Y. 2017) (quotations and citation omitted); *see StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 307 (2d Cir. 2014) ("With respect to factual contentions, 'sanctions may not be

imposed unless a particular allegation is utterly lacking in support.'" (quoting *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 388 (2d Cir. 2003))).

"It is well established that Rule 11 applies to *pro se* litigants." *Smith v. Educ. People, Inc.*, 233 F.R.D. 137, 142 n.9 (S.D.N.Y. 2005) (citing cases), *aff'd*, No. 05-2971-CV, 2008 WL 749564 (2d Cir. Mar. 20, 2008). "However, where a *pro se* litigant is alleged to have run afoul of Rule 11, courts generally apply a more lenient standard than would be applicable where a party is represented by learned counsel." *Sachs v. Matano*, No. CV 15-6049 (JFB) (AKT), 2016 WL 4179792, at *7 (E.D.N.Y. July 15, 2016), *report and recommendation adopted*, No. 15-CV-6049 (JFB) (AKT), 2016 WL 4186708 (E.D.N.Y. Aug. 4, 2016); *see Maduakolam v. Columbia Univ.*, 866 F.2d 53, 56 (2d Cir. 1989) ("While it is true that Rule 11 applies both to represented and *pro se* litigants, the court may consider the special circumstances of litigants who are untutored in the law."). Even still, this leniency towards *pro se* litigants is not static. "Rule 11's application [is] determined on a sliding scale according to the litigant's level of sophistication." *Horton v. Trans World Airlines Corp.*, 169 F.R.D. 11, 16 (E.D.N.Y. 1996). Accordingly, while all *pro se* litigants deserve some degree of leniency, "where a litigant has some experience with the legal system, courts may treat him less leniently than 'wholly inexperienced *pro se* litigants.'" *Sachs*, 2016 WL 4179792, at *7 (quoting *Muniz v. Goord*, No. 9:04-CV-0479, 2007 WL 2027912, at *6 n.30 (N.D.N.Y. July 11, 2007) ("My review of the applicable law suggests that courts need not treat special status as an 'all or nothing' benefit but may confer special status to a semi-experienced *pro se* litigant on a 'sliding scale,' treating the litigant more

leniently than represented litigants but not as leniently as wholly inexperienced *pro se* litigants.")).

Notably, "even when a district court finds a violation of Rule 11, [t]he decision whether to impose a sanction for a Rule 11(b) violation is . . . committed to the district court's discretion." *Ipcon Collections LLC*, 698 F.3d at 63 (quotations and citation omitted). That broad discretion also extends to "tailoring appropriate and reasonable sanctions." *S.E.C. v. Smith*, 710 F.3d 87, 98 (2d Cir. 2013) (quotations and citation omitted).

In order to pursue sanctions under Rule 11, the party who has filed the document must first have "an opportunity to withdraw or correct a challenged submission." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 (2d Cir. 2003).

> Where a sanction is initiated by a party's motion, this provision requires initial service of the motion but delays filing or presentation of the motion to the court for 21 days; filing of the motion is permitted 21 days after service only if the challenged submission is not "withdrawn or appropriately corrected."

*Id.* (citation omitted). "The safe-harbor provision is a strict procedural requirement." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012).

Defendant has confirmed that it complied with Rule 11's safe harbor provision. (Dkt. 86-4 at ¶¶ 16-18). Specifically, Defendant sent Plaintiff a letter on February 13, 2026, attaching a copy of the motion and noting that Plaintiff had 21 days to withdraw the improper 2026 filings, but Defendant did not receive a response from Plaintiff. (*Id.* at ¶¶ 16-17). Defendant followed up with Plaintiff on March 9, 2026, but received no

- 33 -

response. (*Id*. at ¶ 18). Plaintiff has not withdrawn the documents. The Court notes that although Defendant complied with the Rule 11 safe harbor provision by serving Plaintiff with a copy of the motion papers at least 21 days in advance of filing its motion for sanctions, it is not clear whether Plaintiff received a copy of the motion papers, given Plaintiff notified the Court on January 15, 2026 that he would be out of the country visiting his mother and did not know when he would return. (*See* Dkt. 84).

As explained above, the Court has reviewed and considered all of Plaintiff's filings in connection with the motion for summary judgment. The Court has granted summary judgment in favor of Defendant, and therefore the striking of the January 2026 filings by Plaintiff would be of no further benefit to Defendant. However, the Court will direct the Clerk of Court to strike from the docket Plaintiff's memorandum of law in opposition to Defendant's motion to strike, as that memorandum appears to include hallucinated cases. (*See* Dkt. 79 at 2, 3, 6).

While the Court agrees that Plaintiff's filings are voluminous, and some of them were improperly and/or untimely filed, the Court cannot conclude at this time that Plaintiff's actions were taken in bad faith. For instance, while Plaintiff has advocated zealously on his behalf, he has not engaged in inflammatory name-calling. In sum, the Court concludes that the imposition of monetary sanctions is not warranted at this time. This is so especially considering Plaintiff's *pro se* status, and because the Court has not previously admonished or warned Plaintiff that monetary sanctions could be imposed. *Horton*, 169 F.R.D. at 16.

Accordingly, Defendant's motion for sanctions (Dkt. 86) is denied without prejudice. **But Plaintiff is hereby further warned that any future violation of Rule 11 may result in appropriate sanctions.** This formal admonishment is consistent with other cases in this Circuit. *See, e.g., Newman & Cahn, LLP v. Sharp*, 388 F. Supp. 2d 115, 119 (E.D.N.Y. 2005) ("Linda Sharp is warned that the filing of another frivolous paper with the Court may result in monetary sanctions under Rule 11."); *Horton*, 169 F.R.D. at 16 ("[T]he plaintiff is expressly placed on notice of his duty to conduct reasonable inquiry into the law, and that his failure to comport with this standard may result in the imposition of sanctions against him.").

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 54) is granted, Defendant's motion to strike directed to Plaintiff's summary judgment filings (Dkt. 72) is denied, Plaintiff's motion for leave to file excess pages (Dkt. 76) is granted, and Defendant's motion for sanctions (Dkt. 86) is denied without prejudice except that the Clerk of Court is directed to strike Docket 79 from the docket. The Clerk of Court is also directed to enter judgment in favor of Defendant and to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:        March 30, 2026
              Rochester, New York